**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
*Southern Division*

|  |  |  |
|---|---|---|
| BAE SYSTEMS TECHNOLOGY<br>    SOLUTION & SERVICES, INC., | * | |
| | * | |
| **Plaintiff,** | * | |
| | * | |
| v. | * | Case No.:   PWG-14-3551 |
| | * | |
| REPUBLIC OF KOREA'S DEFENSE<br>    ACQUISITION PROGRAM<br>    ADMINISTRATION, *et al.,* | * | |
| | * | |
| **Defendants.** | | |

\*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*     \*

<u>**MEMORANDUM OPINION**</u>

The United States Government hired BAE Systems Technology Solution & Services, Inc. ("BAE") as the lead contractor for an agreement between the U.S. Government and the Republic of Korea's Defense Acquisition Program Administration ("DAPA") "under the U.S. Foreign Military Sales ('FMS') Program to upgrade South Korea's existing fleet of F-16 fighter aircraft for approximately $1.7 billion."  Second Am. Compl. ¶ 1, ECF No. 22.  Before the governments finalized their agreement, BAE entered into a Memorandum of Agreement ("MOA") with DAPA and "provided DAPA with a Letter of Guarantee for Payment of Bid Bond in the amount of $43,250,000" ("Guarantee"), under which BAE agreed "to pay the bond if it failed to take certain actions during the bid phase of the Upgrade Program."  *Id.* ¶ 3.  According to BAE, "DAPA continued to insist that BAE [] renew its Letter of Guarantee," even after the FMS contract was in effect, and BAE complied.  *Id.* ¶ 23.

BAE "performed successfully the initial phases of work under the KF-16 Upgrade Program."  *Id.* ¶ 1.  But then, "the U.S. Government informed South Korea that the overall price

of the Upgrade Program could increase by as much as $800 million," *id.* ¶ 2, and the U.S. Air Force "terminated for convenience" BAE's contract, at South Korea's direction to cancel BAE's "selection . . . as the KF-16 system integrator for the KF-16 Upgrade Program," *id.* ¶ 4.   DAPA now demands payment under the renewed Guarantee, and in BAE's view, "bases its claim for payment not on an alleged violation of the terms of the Guarantee, but on BAE[]'s inability to force the U.S. Government to withdraw its proposed price increases." *Id.* ¶ 5.

BAE filed this declaratory judgment action,[1] seeking a declaration of rights under the contracts between the parties.   *Id.* Primarily, BAE seeks a declaration that the Guarantee is "incompatible with, and invalid under, the Foreign Military Sales Program ("FMS Program') and federal common law of the United States, and . . . therefore unenforceable"; alternatively, it seeks a declaration that it "did not fail to perform any obligations required of it under such Letter(s) of Guarantee." *Id.*   When South Korea challenged the propriety of this venue, I permitted BAE to file an amended complaint to address venue in further detail, ECF No. 21, which it did, Second Am. Compl.   After BAE filed suit in this Court, Defendants initiated an action for breach of contract in South Korea.   *See* Defs.' Mem. 3, ECF No. 26-1; Pl.'s Opp'n 9, ECF No. 27.   As of October 6, 2015, BAE had not been served in that lawsuit, *see* Pl.'s Opp'n 9; Gregory Williams Decl. ¶ 4, ECF No. 27-7, and the parties have not informed the Court of any subsequent service.

Still questioning this Court's authority to hear the case, South Korea filed a motion to dismiss or, alternatively, to stay this case during the pendency of its suit against BAE in South

---

[1] BAE originally filed suit against DAPA, Compl., ECF No. 1, and then amended to name the Republic of Korea as a second defendant, Am. Compl., ECF No. 12.   I refer to Defendants together as "South Korea."

Korea, ECF No. 26.  The parties fully briefed the motion, and it is ripe for resolution.[2]  ECF Nos.

26-1, 27, 34-1.  Because venue is proper, I will not dismiss this case.  Moreover, I will not

exercise my discretion to dismiss this case under *forum non conveniens*, or to stay it, because the

MOA's validity is entwined with the FMS Program, which is a matter of national security, such

that venue certainly should be in this Court.

## **Procedural Motions**

Prior to addressing the substantive motion, I will address the various pending procedural

motions.  South Korea filed a consent motion for a two-week extension of time to file its reply,

ECF No. 28, which I granted, ECF No. 29.  On November 2, 2015, South Korea filed an

Opposed Motion to Extend Deadline for Defendants' Reply Brief, seeking three additional

business days in which to file a reply and informing the Court that BAE indicated that it would

not consent, ECF No. 30, followed one day later by a Motion for Expedited Consideration of

Opposed Motion to Extend Deadline for Defendants' Reply Brief, ECF No. 31. Thereafter,

South Korea filed a timely reply on November 4, 2015, ECF No. 32.  South Korea's Opposed

Motion to Extend Deadline and Motion for Expedited Consideration ARE DENIED AS MOOT.

South Korea filed a twenty-nine page reply, despite the fifteen-page limit I imposed, *see*

ECF No. 21.  It stated that "due to time constraints, Defendants were unable to address spacing

issues prior to the filing deadline."  Defs.' Reply 1 n.1.  Concomitantly, South Korea filed a

Motion for Leave to File Brief in Excess of Page Limits, again stating that it "lacked sufficient

time to refine and shorten Defendants' reply brief."  ECF No. 33.  And, on November 6, 2015,

South Korea filed a Motion for Leave to File Corrected Brief, ECF No. 34, to which it attached a

---

[2] A hearing is not necessary.  *See* Loc. R. 105.6.

reply correcting typographical errors, ECF No. 34-1, and a table of authorities that it had omitted, ECF No. 34-2.

Plaintiff opposed South Korea's motion to exceed the page limit and moved to strike the reply on that ground, and to strike Paragraph 20 of the Second Declaration of Colonel Byeong Ho Kang, Director of DAPA's Fighter Project Team, ECF No. 32-1, which South Korea submitted in support of its reply, on the basis that it "improperly presents new evidence." ECF No. 37. BAE acknowledged that "[t]he Court orally informed the parties that they could submit an additional 5 pages if required." Pl.'s Opp'n & Mot. to Strike 2 n.1. Indeed, BAE submitted an additional five pages in its opposition. BAE asks the Court to, "[a]t a minimum, [strike] the pages in excess of the 15-page limit . . . (*i.e.,* pages 16–29)," or alternatively, to permit BAE to file a ten-page sur-reply. *Id.* at 3. BAE asserts that South Korea "raises new and unfounded arguments that should not be credited and to which BAE TSS should be afforded the opportunity to respond." *Id.* Plaintiff did not oppose specifically Defendants' motion to correct typographical errors.

Insofar as South Korea sought to exceed the page limit due to lack of time to draft a shorter reply, South Korea's Motion for Leave to File Brief in Excess of Page Limits IS GRANTED, and South Korea's Motion for Leave to File Corrected Brief IS GRANTED. However, insofar as South Korea raises new arguments in its reply, BAE's Motion to Strike the reply IS GRANTED. I will not consider any new arguments raised. *See United States v. Williams*, 445 F.3d 724, 736 n.6 (4th Cir. 2006) (declining to address argument raised for first time in reply brief because it "comes far too late in the day").

Paragraph 20 of Colonel Kang's Second Declaration describes negotiations between the parties pertaining to Article 10, the forum-selection clause, of their MOA. Kang Second Decl.

¶ 20.  Specifically, he states that BAE's "representatives at the negotiation meeting indicated that they understood and acknowledged that the Seoul Central District Court would have exclusive jurisdiction to hear any disputes concerning the MOA and approved the text of Article 10 with such understanding."  *Id.*  I only would consider this parol evidence if I were construing ambiguous language in the contract.  *See Signal Perfection, Ltd. v. McPhee Elec., Ltd.*, No. WGC-10-2331, 2015 WL 5136565, at *14 (D. Md. Aug. 31, 2015) ("Under Maryland law, in the absence of fraud, duress or mistake, 'parol evidence of conversations or alleged conversations made before or at the time of the integration of the contract into writing must be excluded from evidence....'") (quoting *Kermisch v. Sav. Bank of Balt.*, 295 A.2d 776, 778 (Md. 1972))). Because I am not construing ambiguous language, I will not consider Kang's statements regarding the parties' understanding of the forum selection clause, and BAE's Motion to Strike Paragraph 20 of Colonel Kang's Second Declaration IS DENIED AS MOOT.

The parties also filed a joint request to file only the relevant portions of the longer exhibits, which each exceed one hundred pages.  ECF No. 38.  The parties already filed significant portions of the longer exhibits electronically, and in this regard, worked collaboratively to file and highlight the exhibits in compliance with the Case Management Order, ECF No. 8.  I appreciate their efforts and, as I have resolved the pending motion, it is not necessary to file courtesy copies of the lengthy exhibits.

The parties also filed a Joint Motion to Seal, ECF No. 41, asking the Court to seal certain exhibits.  Given that the parties jointly filed the motion; the documents in question contain sensitive pricing information, proprietary business information, confidential information that "potentially implicates both U.S. Government and ROK national security interests," and information implicating the privacy interests of non-parties; and, to the extent feasible, the

parties filed redacted versions for the public, the Joint Motion to Seal IS GRANTED.  Although these documents are sealed, I have determined, after reviewing this Memorandum Opinion, that none of its contents warrants sealing.

### **Foreign Military Sales Program**

Military equipment manufacturers in the United States may sell their equipment to foreign governments through Direct Commercial Sales ("DCS") or the Foreign Military Sales ("FMS") Program. *Sec'y of State for Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 703 (4th Cir. 2007).  The FMS Program "provides a mechanism for the United States government to sell defense articles and services to foreign governments," where the President finds "that the sale 'will strengthen the security of the United States and promote world peace.'"  *Heroth v. Kingdom of Saudi Arabia*, 565 F. Supp. 2d 59, 61 (D.D.C. 2008), *aff'd*, 331 F. App'x 1 (D.C. Cir. 2009) (quoting 22 U.S.C. § 2753(a)(1) (provision of Arms Export Control Act, 22 U.S.C. §§ 2751 *et seq.*)). In the FMS Program, "the United States and the foreign government purchaser enter into a contract for the goods, which the United States then provides from its own inventory or purchases from a domestic contractor through a separate agreement." *Trimble*, 484 F.3d at 703. Thus, "[a]n FMS purchase involves two contracts: one between the foreign government and the United States, termed the Letter of Agreement ("LOA"), and one between the United States and the domestic contractor." *Id.* "Notably, *there is no contract between the foreign government and the defense contractor*" when a foreign government acquires goods or services through the FMS Program.  *Heroth*, 565 F. Supp. 2d at 61–62 (emphasis added).  In contrast, the foreign government and the domestic contractor enter into their own agreement in a DCS transaction. *Trimble*, 484 F.3d at 703.

Here, the parties agree that South Korea contracted to upgrade its F-16 fighter aircraft fleet through the FMS Program.  *See* Second Am. Compl. ¶¶ 1, 23; Defs.' Mem. 2, 8–9.  Indeed, South Korea informed BAE "that it was amenable to using a hybrid [DCS-FMS] transaction model if BAE [] could obtain the consent of the U.S. Government to such a model," but "BAE[]'s negotiations with the U.S. Government about using a hybrid model were unsuccessful."  Kang Second Decl. ¶ 24.  Without the hybrid option, the parties could not enter into an agreement while proceeding under the FMS Program because "there is no contract between the foreign government and the defense contractor."  *Heroth*, 565 F. Supp. 2d at 61–62.  In BAE's view, the parties' MOA, which it entered into with South Korea before South Korea and the United States reached an LOA, terminated when the two governments finalized their FMS contract.  Pl.'s Opp'n 6–7.  Further, according to BAE, the Guarantee and the MOA "are inconsistent with, and unenforceable under, the FMS Program and federal common law," because "[o]nce South Korea elected to structure the KF-16 Upgrade Program as a Foreign Military Sale and entered into the LOA in late 2013, DAPA was not permitted . . . to enter into any direct contractual relationship with BAE."  Second Am. Compl. ¶ 26.  On this basis, BAE seeks to have the agreements between the parties declared unenforceable.  *Id.* ¶ 5.  As South Korea sees it, however, the Guarantee and MOA preceded the LOA it entered into under the FMS Program and exist as valid, independent contracts.  *See* Defs.' Mem. 2, 3 n.4, 8–9, 25 n.32.

## **Motion to Dismiss**

### I.      **Improper Venue**

Venue is proper in a civil action against a foreign state, such as South Korea, "in any judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated."  28 U.S.C.

§ 1391(f)(1).  "It is sufficient that a substantial part of the events occurred in a district, 'even if a greater part of the events occurred elsewhere.'"  *Doka USA, Ltd. v. Gateway Project Mgmt., LLC*, No. WDQ-10-1896, 2011 WL 3236091, at *4 (D. Md. July 27, 2011) (quoting *Power Paragon, Inc. v. Precision Tech. USA, Inc.,* 605 F. Supp. 2d 722, 726 (E.D.Va.2008)).  In breach of contract claims, such as this one, "courts consider a number of factors, including where the contract was negotiated or executed, where it was to be performed, and where the alleged breach occurred."  *Structural Grp. v. Fyfe Co.*, No. CCB-14-78, 2014 WL 3955439, at *3 (D. Md. Aug. 11, 2014).

If venue is improper, Fed. R. Civ. P. 12(b)(3) provides a basis for dismissal.  *See Am. Ins. Mktg. Corp. v. 5 Star Life Ins. Co.*, 958 F. Supp. 2d 609, 612 (D. Md. 2013).  On a Rule 12(b)(3) motion to dismiss, to "determin[e] whether events . . . are sufficiently substantial to support venue under [§ 1391]," a court "should review 'the entire sequence of events underlying the claim'" instead of "focus[ing] only on those matters that are in dispute or that directly led to the filing of the action."  *Mitrano v. Hawes*, 377 F.3d 402, 405 (4th Cir. 2004).  The court may consider evidence outside the pleadings.  *Am. Ins. Mktg. Corp.*, 958 F. Supp. 2d at 612; *see Sucampo Pharms., Inc. v. Astellas Pharma, Inc.*, 471 F.3d 544, 550 (4th Cir. 2006)).  The court draws all reasonable inferences in the light most favorable to the plaintiff, which "need only make 'a *prima facie* showing of proper venue in order to survive a motion to dismiss' when the court does not hold an evidentiary hearing.  *Am. Ins. Mktg. Corp.*, 958 F. Supp. 2d at 612 (quoting *Aggarao v. MOL Ship Mgt. Co., Ltd.,* 675 F.3d 355, 366 (4th Cir. 2012) (citing *Mitrano v. Hawes,* 377 F.3d 402, 405 (4th Cir. 2004)); citing *CoStar Realty Info., Inc. v. Field,* 612 F. Supp. 2d 660, 672 (D. Md. 2009)).

South Korea argues for dismissal for improper venue "because BAE [] has failed to demonstrate that any event or omission giving rise to the claims in this case occurred in Maryland." Defs.' Mem. 14.  In support, it provides the Declaration of Colonel Byeong Ho Kang, Director of DAPA's Fighter Project Team, who asserts that no one from South Korea went to Maryland and that they only communicated with BAE through its branch located in South Korea, not the BAE headquarters in Maryland. Kang Decl. ¶¶ 3, 45–53, ECF No. 26-2.

BAE counters that venue is proper under § 1391(f)(1) because "[t]he KF-16 Upgrade Program history is replete with Maryland-based activities and, in any light, those activities constitute a substantial portion of the activities that gave rise to the claims at issue." Pl.'s Opp'n 19 (citing Second Am. Compl. ¶¶13–20).  As BAE reads it, Colonel Kang's Declaration only establishes that "DAPA officials did not meet in person with BAE [] personnel in Maryland," which BAE insists is "not required for venue to be proper," and that, insofar as Colonel Kang "asserts that all of DAPA's 'key communications' were to BAE employees based outside of Maryland," the statement "is incorrect" and "should be disregarded in its entirety." Pl.'s Opp'n 20 (citing Kang Decl. ¶ 53).

To establish venue, BAE argues that BAE's headquarters are located in Maryland and the following events occurred in Maryland:

> 15. From those headquarters, David Herr, the President of the Support Solutions Sector, the relevant BAE business sector, and other executives, participated in, and supervised, the formulation of the strategy to pursue the KF-16 Upgrade Program, the formulation of the bids for that Program, the negotiation and completion of the MOA and the initial Letter of Guarantee and several renewals thereof, and communications and negotiations with the USAF leading to the firm-fixed price FMS contract for the Program.
>
> 16. From those headquarters, Doug Coleman, the Vice President and Chief Counsel for the Support Solutions Sector and Vice President and Secretary of BAE TSS, negotiated the initial Letter of Guarantee and several renewals thereof,

which Mr. Coleman signed on behalf of BAE TSS, and assisted in the negotiation of the MOA.

 17. From those headquarters, Raymond Piselli, Vice President of Contract for BAE TSS, engaged in multiple phone calls and meetings with DAPA and other Korean officials, including officials in the Korean Air Force, and USAF officials to address the numerous commercial and technical issues involved in the KF-16 Upgrade Program, including the MOA, which Mr. Piselli signed on behalf of BAE TSS.

 18. Additional BAE TSS and Support Solutions Sector employees based in the BAE TSS headquarters participated in and supported the formulation for the bids for the KF-16 Upgrade Program, preparation and negotiation of the relevant agreements, discussions concerning other commercial and technical understandings with DAPA and the USAF, and performance under the FMS contract.

 19. The BAE TSS export control, information security, finance, accounting, purchasing, and human resources departments supporting the KF-16 Upgrade Program were located in Maryland during both the bid and performance stages.

 20. The FMS contract for the KF-16 Upgrade Program was administered by DCMA (Defense Contract Management Agency) Baltimore, located at 217 East Redwood Street, Suite 1800, Baltimore, MD 21202-5299. DCMA is the agency responsible for performing contract administration services for the Department of Defense.

Second Am. Compl. ¶¶ 14–20.

South Korea contends that these allegations are "general, unsupported, and vague," Defs.' Mem. 18, and "do not identify a single meeting or negotiation that occurred in Maryland in which a DAPA representative participated, a single communication or draft document that DAPA sent to Maryland, or even a single representative of DAPA that ever visited Maryland in relation to the KF-16 Upgrade Program," *id*. at 19. Essentially, South Korea contends that the enumerated events could not be substantial because they involved only Plaintiff's personnel and not Defendants'. *See id.*

Yet, South Korea did not have to participate in the events for them to be "a substantial part of the events . . . giving rise to the claim" and to form a basis for venue in Maryland, *see* 28

U.S.C. § 1391(f)(1), if the events nonetheless substantially contributed to contract formation or performance. *See Structural Group*, 2014 WL 3955439, at *1, 3 (analyzing venue under § 1391(b)(2), which contains relevant language identical to § 1391(f)). In *Structural Group*, a breach of contract action in which the plaintiff's "employees who negotiated the [contract] reside[d] or work[ed] in Maryland, its CEO executed the [contract] in Maryland, it ordered Fyfe's products from its Maryland office, and it sent payments from its Maryland office to California," the defendant challenged this Court's jurisdiction. 2014 WL 3955439, at *1, 3. Based on these events, this Court concluded that "a substantial part of the events giving rise to th[e] action occurred in Maryland," even though the defendant "and its representatives engaged in corresponding activities in California," not Maryland. *Id.* at *3; *see also Imperium Ins. Co. v. Allied Ins. Brokers, Inc.*, No. CCB-12-1373, 2012 WL 4103889, at *4 (D. Md. Sept. 17, 2012) (concluding that, even though the defendants "all reside[d] and work[ed] exclusively in Maryland, the Southern District of New York was "the appropriate venue" under § 1391(b)(2), which has relevant language identical to § 1391(f), because "Imperium was based in New York during the contract's negotiation and duration," which created "a sufficient nexus between that venue and the contract at issue under § 1391"); *Am. Bank Holdings, Inc. v. Grange Mut. Cas. Co.*, No. DKC 09-2228, 2010 WL 2302356, at *6 (D. Md. June 7, 2010) (discussing § 1391(a), which contains language identical to (f), and observing that, when "the negotiations leading up to the merger agreement took place by email and telephone between parties in Maryland and Ohio . . . , they occurred in both states").

Through Colonel Kang's Declaration, South Korea further questions the significance and substantiality of the Maryland events that allegedly were part of the negotiation process or contract performance. *See* Kang Decl. ¶¶ 45–53. Specifically, Colonel Kang declared that he

only knew of communications between South Korea and the Korean branch of BAE regarding the KF-16 Upgrade Program during the procurement process, *id.* ¶¶ 45–48, and that none of BAE Systems International – Korea's "key communications [with other BAE representatives] concerning the KF-16 Upgrade Program" were with BAE representatives located in Maryland, *id.* ¶ 53.  Indeed, "'[e]vents or omissions that might only have some tangential connection with the dispute in litigation are not enough. Substantiality is intended to preserve the element of fairness so that a defendant is not haled into a remote district having no real relationship to the dispute.'"  *CMA CGM (Am.), LLC v. RLI Ins. Co.*, No. 12-3306-AW, 2013 WL 588978, at *2 (D. Md. Feb. 13, 2013) (quoting *Cottman Transmission Sys., Inc. v. Martino,* 36 F.3d 291, 294 (3d Cir. 1994)).

But, the Declaration of Douglas Coleman, Vice President and Secretary of BAE, that BAE attached to its Opposition shows, with supporting documents, the extent of events that took place in Maryland.  *See* ECF No. 27-2.  For example, Coleman declared that he "drafted, signed and/or supported negotiations of agreements and other documents with . . . DAPA[] in connection with the KF-16 Program from [his] Maryland offices, including the Memorandum of Agreement and the Letters of Guarantee."  Coleman Decl. ¶ 4.  He stated that he "drafted BAE[]'s original Bid Guarantee" and "signed the Bid Guarantee from [his] offices in Maryland," *Id.* ¶ 8.  He stated that he also signed at least two revisions to the guarantee "from [his] Maryland offices."  *Id.* ¶¶ 9–10.  The Joint Record includes the Letter of Guarantee from BAE, along with four Revisions, with Coleman's signature.  Jt. Rec. 811–16 (Jt. Exs. 28–32).  Additionally, Coleman stated that he signed two Confirmations of Direct Transaction "from [his] Maryland offices"; BAE submitted those confirmations to DAPA.  Coleman Decl. ¶¶ 22, 23; *see* Jt. Rec. 894, 895 (Jt. Exs. 39, 40).

Coleman also declared that "BAE [] was the company that submitted a proposal for the Program [and] responded to requests for information from both DAPA and the U.S. Air Force." Coleman Decl. ¶ 5.   The Proposal for the KF-16 Upgrade Program was "Prepared" for South Korea by BAE in Rockville.   Jt. Rec. 820–21 (Jt. Ex. 35).   Coleman stated that "from its Maryland office, BAE [] sought approval from the U.S. Government to export technical data in connection with pre-contract discussions for the KF-16 Program," Coleman Decl. ¶ 7, citing a letter from BAE in Rockville, Maryland to the Director of the Office of Defense Trade Controls Licensing in Washington, D.C., Jt. Rec. 806 (Jt. Ex. 27).   Coleman also stated that "BAE [] responded to DAPA's questions concerning its Response to the KF-16 RFP from its Rockville offices."   Coleman Decl. ¶ 24; *see* Jt. Rec. 896 (Jt. Ex. 41).   Also, Raymond Piselli, Vice President of Contracts for the Support Solutions Sector of BAE, sent the Fighter Project Team a Manufacturer's Certificate for the KF-16 Upgrade Program, and he signed it before a notary in Carroll County, Maryland.   Jt. Rec. 893 (Jt. Ex. 38).

To rebut this evidence of substantial activity in Maryland, South Korea resorts to semantics, insisting that words like "based" and "from" do not establish that events occurred "in" Maryland. Defs.' Reply 21–23.   It is true that assertions that BAE personnel were "based in Maryland" or "Maryland-based," *see, e.g.*, Piselli Decl. ¶ 4, ECF No. 27-3, do not necessarily establish that their work occurred in Maryland, as they could have been based in Maryland but working elsewhere.   Further, a document "prepared by BAE [], listing its . . . Rockville, MD 20852 address," *id.* ¶ 6, was not necessarily prepared at that Maryland address.   Consequently, Piselli's Declaration does not show that he, personally conducted any work with regard to the KF-16 Upgrade Program in Maryland, other than signing a Manufacturer's Certificate "in Maryland." *Id.* ¶ 8.

In contrast, however, stating that an action happened "from . . . offices in Maryland," *see, e.g.*, Coleman Decl. ¶¶ 4, 7, 8, 9, 10, 22, 23, 24, clearly indicates that the action happened in Maryland. *See* from, www.oed.com ("Denoting departure or moving away: governing a n[oun] [here, Maryland] which indicates a point of departure or *place whence motion takes place*." (emphasis added)). Thus, drawing all reasonable inferences in the light most favorable to BAE, *see Am. Ins. Mktg. Corp.*, 958 F. Supp. 2d at 612, Coleman's Declaration describes sufficient actions to establish that the contract was negotiated and executed, in part, in Maryland, a factor that this Court considers in assessing venue. *See Structural Grp.*, 2014 WL 3955439, at *3. Contract negotiations necessarily are more than tangentially connected to this contractual dispute: They establish a "real relationship" between Maryland and the parties' dispute, such that it would be fair for South Korea to have to appear in this Court. *See CMA CGM (Am.)*, 2013 WL 588978, at *2. This evidence demonstrates that "a substantial part of the events . . . giving rise to the claim occurred" in Maryland. *See* 28 U.S.C. § 1391(f)(1). Therefore, BAE has made a *prima facie* showing of proper venue. *See Am. Ins. Mktg. Corp.*, 958 F. Supp. 2d at 612; *see also Aggarao*, 675 F.3d at 366. Rule 12(b)(3) does not provide a basis for dismissal of this action.

## II.      *Forum Non Conveniens*

Notwithstanding proper venue, a court may dismiss an action under the doctrine of *forum non conveniens*. *Am. Dredging Co. v. Miller*, 510 U.S. 443, 448 (1994), and South Korea argues that the Court should exercise this discretion to dismiss "because the parties' [MOA] indicates that the Korean Court has exclusive jurisdiction over the claims here." Defs.' Mem. 14. BAE counters that the forum-selection clause in the MOA is permissive, granting jurisdiction to the Seoul Central District Court without excluding jurisdiction from this Court, such that dismissal is unwarranted. Pl.'s Opp'n 10.

The forum-selection clause in the MOA between South Korea and BAE provides:

**Article 10 (Settlement of Dispute)**

In any incident if a dispute were to arise between DAPA, ROK, and BAE Systems Technology Solution & Services Inc[.] relating to or arising from this MOA, and an agreement cannot be met between the two parties within 30 days from the outbreak of the dispute, it shall be resolved through a litigation and the Seoul Central District Court shall hold jurisdiction."

MOA art. 10, Jt. Rec. 559–60 (Jt. Ex. 11), ECF No. 40-5.

If a forum-selection clause grants jurisdiction to a foreign forum, "the appropriate way to enforce [it] is through the doctrine of *forum non conveniens*."[3] *Atl. Marine Constr. Co. v. U.S. Dist. Court for W. Dist. of Texas*, 134 S. Ct. 568, 580 (2013).   This common-law doctrine provides federal courts with "discretion to dismiss a case 'when an alternative [foreign] forum has jurisdiction to hear [the] case, and ... trial in the chosen forum would establish ... oppressiveness and vexation to a defendant ... out of all proportion to plaintiff's convenience.'" *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 429 (2007) (quoting *Am. Dredging Co. v. Miller*, 510 U.S. 443, 447–48 (1994) (quoting *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 241 (1981) (quoting *Koster v. (Am.) Lumbermens Mut. Cas. Co.*, 330 U.S. 518, 524 (1947)))); *Poe v. Marquette Cement Mfg. Co.*, 376 F. Supp. 1054, 1060 (D. Md. 1974).   The court considers "a 'range of considerations, most notably the convenience to the parties and the practical difficulties that can attend the adjudication of a dispute in a certain locality.'" *Sinochem*, 549 U.S. at 429 (quoting *Quackenbush v. Allstate Ins. Co.,* 517 U.S. 706, 723 (1996)).

---

[3] 28 U.S.C. § 1404(a), in contrast, "provides a mechanism for enforcement of forum-selection clauses that point to a particular *federal district*." *Atl. Marine Constr. Co.*, 134 S. Ct. at 579 (emphasis added).   Section 1404(a) codifies the common law doctrine "for the subset of cases in which the transferee forum is within the federal court system"; the analysis under both is the same.   *Id.* at 580.

When the plaintiff brings suit in its home forum, the defendant "bears a heavy burden in opposing the plaintiff's chosen forum." *Id.* at 430.

"The calculus changes, however, when the parties' contract contains a valid forum-selection clause" in which "a plaintiff agrees by contract to bring suit *only* in a specified forum," and which "'represents the parties' agreement as to the most proper forum.'" *Atl. Marine Constr. Co.*, 134 S. Ct. at 581, 582 (emphasis added) (citation omitted). Under such circumstances, that clause "[should be] given controlling weight in all but the most exceptional cases." *Id.* at 581. Thus, unlike "[i]n the typical case not involving a forum-selection clause, . . . the plaintiff's choice of forum merits no weight." *Id.* Indeed, "as the party defying the forum-selection clause, the plaintiff bears the burden of establishing that transfer to the forum for which the parties bargained is unwarranted." *Id.* Additionally, in analyzing a motion to dismiss for *forum non conveniens*, based on a forum-selection clause, a court "should not consider arguments about the parties' private interests," although it still may "consider arguments about public-interest factors." *Id.* at 582. And, "[b]ecause those factors will rarely defeat a . . . motion [to dismiss], the practical result is that forum-selection clauses should control except in unusual cases." *Id.*

The critical question, of course, is whether the forum-selection clause in the MOA grants exclusive jurisdiction to the foreign forum. *See Koch v. Am. Online, Inc.*, 139 F. Supp. 2d 690, 693 (D. Md. 2000) ("Only a mandatory forum selection clause will be enforced; a permissive one will not require dismissal."); *Atl. Marine Constr. Co.*, 134 S. Ct. at 582 ("[W]hen a plaintiff agrees by contract to bring suit *only* in a specified forum . . . . [o]nly that initial choice [of forum] deserves deference." (emphasis added)). To answer this, I first must determine the law that applies. South Korea analyzes the clause under federal law and, alternatively, under Korean law (under Maryland conflicts law) and arrives at the same conclusion, that the clause is mandatory.

*See* Defs.' Mem. 17 (noting that in *Coastal Mechanics Co. v. Defense Acquisition Program Administration*, 79 F. Supp. 3d 606 (E.D. Va. 2015), the Eastern District of Virginia applied federal law even though it "found it unclear whether Korean law 'or federal law governs whether [a forum-selection] clause is mandatory'").  BAE relies on *Albemarle Corp. v. AstraZeneca UK Ltd.*, 628 F.3d 643, 650 (4th Cir. 2010), to argue that federal law should apply, but contends that the clause is permissive under either federal law, Maryland law, or Korean law.  *See* Pl.'s Opp'n 12, 15–16.

Despite their analyses of the outcomes, neither party identifies any authority for applying either Maryland or Korean law to the forum-selection clause.  Indeed, in *Albemarle*, the Fourth Circuit concluded that "*a federal court interpreting a forum selection clause must apply federal law in doing so*," because "a forum selection clause implicates what is recognized as a procedural matter governed by federal law—the proper venue of the court."[4]  628 F.3d at 650 (emphasis added); *see Bank v. Advanced Sys. Servs., Corp.*, No. 09-23, 2009 WL 855730, at *4 (E.D. Va. Mar. 30, 2009) ("[S]ince forum clauses involve procedural issues . . . , federal law . . . should determine whether a forum clause is mandatory or permissive.").  Therefore, I will apply federal law.  *See Albemarle*, 628 F.3d at 650.

Under federal law, "[a] general maxim in interpreting forum-selection clauses is that 'an agreement *conferring* jurisdiction in one forum will not be interpreted as *excluding* jurisdiction elsewhere unless it contains specific language of exclusion.'" *IntraComm, Inc. v. Bajaj,* 492 F.3d

---

[4] Although the Supreme Court later held that "a forum-selection clause does not render venue in a court 'wrong' or 'improper' within the meaning of § 1406(a) or Rule 12(b)(3)," *see Atl. Marine Constr. Co.*, 134 S. Ct. at 579, a forum selection clause nonetheless affects where a case will proceed, and therefore necessarily still implicates venue. *See Black's Law Dictionary* (10th ed. 2014) (defining venue as "[t]he proper or a possible place for a lawsuit to proceed, usu. because the place has some connection either with the events that gave rise to the lawsuit or with the plaintiff or defendant.").

285, 290 (4th Cir. 2007) (quoting *John Boutari & Son, Wines & Spirits, S.A. v. Attiki Imp. & Distrib., Inc.*, 22 F.3d 51, 53 (2d Cir. 1994) (emphasis in *John Boutari*; internal citation and quotation marks omitted); *see S & D Coffee, Inc. v. GEI Autowrappers,* 995 F. Supp. 607, 609 (M.D.N.C. 1997) ("[W]hile the term 'shall' is mandatory, it directs only that English courts shall have jurisdiction, not that English courts shall 'have exclusive jurisdiction' or that 'venue shall lie in England.' The general rule in such instances is that '[w]hen only jurisdiction is specified the cause will generally not be enforced [as a mandatory forum selection clause] without some further language indicating the parties' intent to make jurisdiction exclusive.'" (citation omitted)). The *IntraComm* Court observed that the forum-selection clause at issue in that case provided that "either party shall be free to pursue its rights at law or equity in a court of competent jurisdiction in Fairfax County, Virginia," and concluded that it was a permissive clause, differentiating it from the mandatory clause at issue in *Excell, Inc. v. Sterling Boiler & Mechanical, Inc.,* 106 F.3d 318 (10th Cir. 1997), which provided that "[j]urisdiction shall be in the state of Colorado." 492 F.3d at 290. In *Congressional Bank v. Potomac Education Foundation, Inc.*, the forum-selection clauses stated that "'Borrower [i.e., the University] irrevocably submits to the jurisdiction of any state or federal court sitting in the State of Maryland over any suit, action, or proceeding arising out of or relating to this Agreement [or Note].'" No. PWG-13-889, 2014 WL 347632, at *10 (D. Md. Jan. 30, 2014) (quoting agreements). This Court concluded that, "[a]s in *IntraComm*, the clauses at issue . . . provide[d] that the Borrower submits to the jurisdiction of Maryland's courts," but did "not mandate that a dispute *only* may be litigated in Maryland." *Id.* at *11 (emphasis added). Thus, the clauses did not prevent another court from having jurisdiction. *Id.* Likewise, in *Bank*, the court concluded that the forum-selection clause at issue was permissive because "the language 'irrevocably

submits to the jurisdiction' d[id] not clearly indicate that the Bank and Defendants intended for Maryland to be the *only* forum for litigation." 2009 WL 855730, at *4. The *Bank* Court relied on *S & D Coffee*, 995 F. Supp. at 610, in which the Middle District of North Carolina "concluded that the language 'both parties *shall submit to the jurisdiction* of the English courts' did not indicate that England had exclusive jurisdiction because, although the term 'shall' is mandatory, the court found that there needed to be more explicit language in the clause stating that jurisdiction was exclusive." *Id.*

South Korea argues that when "the Eastern District of Virginia addressed forum-selection clauses in contracts between DAPA and another U.S.-based government contractor that are identical in their original Korean language in all relevant ways to the forum-selection clause at issue here," the court applied federal law and held that the clauses were mandatory. Defs.' Mem 16–17 (citing *Coastal Mechanics*, 79 F. Supp. 3d at 611). BAE counters that South Korea's "argument fails" because, "in *Coastal Mechanics*, the Korean translation was not before the court." Pl.'s Opp'n 14. Rather, BAE asserts, "[t]he court exclusively reviewed the English text, which was entirely different from the language at issue here," as the English text stated that "'any Dispute *shall be finally settled by litigation* in Seoul Central District Court, Republic of Korea." *Id.* (quoting 79 F. Supp. 3d at 608 (emphasis in Pl.'s Opp'n)). I agree that *Coastal Mechanics*, which is not binding authority in any event, is inapposite, given that the court based its holding on the English text, which differs from the English text of the forum-selection clause currently before me. *See Coastal Mechanics*, 79 F. Supp. 3d at 611. Notably, South Korea does not argue that the Korean language version differs from the English translation or that it should control. Additionally, South Korea's argument that "evidence showing that during negotiations in Korea regarding the MOA, the parties specifically discussed the fact that Article 10 would

vest exclusive jurisdiction over disputes concerning the MOA in the [South Korean court], and they agreed that the English and Korean texts reflected the parties' agreement as to such exclusivity," Defs.' Reply 17, is unpersuasive, because it is parol evidence and, as discussed earlier, I will not consider such evidence in interpreting unambiguous contract language. *See Signal Perfection, Ltd. v. McPhee Elec., Ltd.*, No. WGC-10-2331, 2015 WL 5136565, at \*14 (D. Md. Aug. 31, 2015).

Here, the clause provides that a dispute between the parties related to the MOA "shall be resolved through a litigation *and* the Seoul Central District Court shall hold jurisdiction." MOA art. 10, Jt. Rec. 559–60 (emphasis added). Certainly, it employs the term "shall." But, as the *Bank* Court observed, the term "shall" is only mandatory insofar as it bestows jurisdiction on specific courts; it is not sufficient to exclude jurisdiction from other courts "'without some further language indicating the parties' intent to make jurisdiction exclusive.'" 995 F. Supp. at 610 (citation omitted). This forum-selection clause does *not* state that such a dispute "*shall be resolved through a litigation in* the Seoul Central District Court," or that "*jurisdiction shall be* in the Seoul Central District Court." Consequently, unlike in *Excell*, this clause does not identify one state or country where "[j]urisdiction shall be," to the exclusion of all others. Rather, as in *IntraComm*, *Congressional Bank*, *S & D Coffee*, and *Bank*, this clause identifies a specific court or courts that shall have jurisdiction, without excluding others. There is no "specific language of exclusion," and therefore, under federal law it "will not be interpreted as *excluding* jurisdiction elsewhere." *See IntraComm*, 492 F.3d at 290. Thus, the language is permissive, not mandatory. *See id.*

As noted, I have discretion to dismiss based on a permissive forum selection clause when "trial in the chosen forum would establish ... oppressiveness and vexation to a defendant ... out of

all proportion to plaintiff's convenience.'" *Sinochem*, 549 U.S. at 429. South Korea has not

shown that it will experience such "oppressiveness and vexation." *See id.* Nor has it identified

any "practical difficulties" that will arise if this dispute is adjudicated in this Court. *See id.*;

*Quackenbush,* 517 U.S. at 723. Indeed, it does not address the effects that litigation in this

Court, as opposed to the Korean court, will have on it, focusing its argument instead on the

analysis of a mandatory forum selection clause. *See* Defs.' Mem. 15–18; Defs.' Reply 16–18 &

nn. 24–26. Consequently, South Korea has not met its "heavy burden in opposing the plaintiff's

chosen forum," and I will not exercise my discretion to dismiss. *See Sinochem*, 549 U.S. at 429–

30.

Moreover, even if the clause were mandatory, granting exclusive jurisdiction to the South

Korea court and compelling me, under most circumstances, to dismiss, *see Atl. Marine Constr.

Co.*, 134 S. Ct. at 581, this case would be, as BAE argues, the "exceptional case" in which the

provision "would not be binding," because "it would preclude consideration of the FMS

regulatory and contractual scheme and the federal common law concerns confirmed in [*Secretary

of State for Defence v. Trimble Navigation Ltd.*, 484 F.3d 700 (4th Cir. 2007)],*" thereby

"violat[ing] public policy and undermin[ing] critical U.S. national security interests." Pl.'s

Opp'n 15 n. 22. BAE contends that

> U.S. law required—and DAPA agreed—that (i) the U.S. Government was solely
> responsible for selecting the contractor, managing its performance, and
> establishing the price for the Program; and (ii) DAPA would "not [] refer" any
> disagreement with the U.S. Government or the contractor regarding pricing or
> performance "to any international tribunal or third party for settlement."

*Id.* at 1.

South Korea is correct that *Trimble* is factually inapposite. *See* Defs.' Reply 11. There,

the Fourth Circuit considered "whether a foreign government is a *third-party beneficiary* of a

contract for military goods between the United States and a domestic military contractor, where the foreign government agreed to purchase those goods from the United States under the Foreign Military Sales program."  484 F.3d at 702 (emphasis added).  Here, in contrast, the domestic military contractor seeks to prevent the foreign government from asserting its rights under the MOA, which is a DCS between the foreign government and the domestic contractor, not the U.S. Government.  *Trimble* nonetheless provides guidance.

The *Trimble* Court compared and contrasted the benefits of DCS transactions, which involve "a direct contract between the foreign government and a domestic contractor," and FMS transactions, which "involve[] two contracts: one between the foreign government and the United States, termed the Letter of Agreement ('LOA'), and one between the United States and the domestic contractor."  483 F.3d at 703.  The Fourth Circuit explained that

> In exchange for some of the advantages of proceeding via FMS . . . the foreign purchaser must relinquish some benefits. One concession is that the United States "selects the source and *manages the contract,* consistent with the provisions of the FAR and the LOA." [Defense Institute of Security Assistance Management, *Online Green Book: The Management of Security Assistance* 15–8, http://disam.osd.mil/pubs/DR/greenbook.htm] (emphasis added). Thus, a foreign purchaser proceeding via FMS necessarily delegates the ability to negotiate and service the contract [with the domestic contractor] to the United States.

*Trimble*, 484 F.3d at 706–07.  The court observed that "in a DCS transaction, a foreign government . . . can sue th[e] manufacturer on the direct agreement," while "*the FMS program requires the intermediation of the United States* and a back-to-back contract structure."  *Id.* at 707 (emphasis added). It stated that "the choice of this structure reflects the national security interests of the United States," and consequently, in that case, where there was no third agreement between the foreign government and the contractor, "it would be contrary to the statutory scheme to imply a direct relationship between the domestic contractor and the foreign purchaser," as "recognize[ing] such a right of action would allow the foreign purchaser to hold

the contractor directly liable for the purchased goods, a level of accountability that may be achieved through a DCS sale." *Id.*  The Fourth Circuit concluded that "recognizing such a right would allow the foreign purchaser to gain an advantage of the DCS program in a situation where United States policy (and the statutory scheme chosen to effectuate that policy) explicitly precludes a DCS arrangement." *Id.*

As noted, this action is distinct from *Trimble* because there is a contract between the foreign government and the domestic contractor.  But, although South Korea and BAE did enter into a direct MOA with respect to certain preliminary stages of the KF-16 Upgrade Program, the actual performance of the upgrades was governed by the LOA entered into between South Korea and the United States Government pursuant to the FMS Program.  The two agreements were inextricably intertwined.  Thus, the crux of the *Trimble* opinion applies: Foreign governments and domestic contractors that choose to proceed under the FMS Program do not contract directly; instead, the foreign government must "delegate[] the ability to negotiate and service the contract to the United States." *Trimble*, 484 F.3d at 707.  Moreover, the FMS Program does not permit the foreign government to sue the domestic contractor, but rather "requires the intermediation of the United States," a requirement that "reflects the national security interests of the United States." *Id.*

Here, South Korea seeks to enforce the MOA it entered into with BAE, notwithstanding the parties' election to have the actual performance of the KF-16 Upgrade Program proceed under the FMS Program, which does not permit direct contracts between foreign governments and domestic contractors.  *See Trimble*, 484 F.3d at 707; *Heroth*, 565 F. Supp. 2d at 61–62.  Indeed, the U.S. Government would not approve BAE's proposal that the parties enter into a "hybrid DCS-FMS transaction."   Kang Second Decl. ¶ 24.  The enforcement of the MOA, in

isolation from the much larger FMS LOA between South Korea and the United States, would fly in the face of the FMS Program and the U.S. Government's directive, which implicates U.S. security interests.  *See Trimble*, 484 F.3d at 707.  And, there is a public interest in national security.  *See Trulock v. Lee*, 66 F. App'x 472, 477 (4th Cir. 2003).  Moreover, it is in the public interest to "enforce[e] a procurement process that conforms with regulatory authority."  *Al Ghanim Combined Grp. Co. Gen. Trad. & Cont. W.L.L. v. United States*, 56 Fed. Cl. 502, 521 (Ct. Fed. Cl. 2003) (considering whether injunctive relief was appropriate with regard to U.S. Army solicitation of construction contract in Kuwait).  Thus, the public interest factor, which the Court still considers under a *forum non conveniens* analysis even when there is a forum-selection clause in which "a plaintiff agrees by contract to bring suit *only* in a specified forum," *Atl. Marine Constr. Co.*, 134 S. Ct. at 581–82 (emphasis added), weighs heavily in favor of a United States court resolving this matter, as it unquestionably implicates national security interests.  *See Trulock*, 66 F. App'x at 477; *Al Ghanim Combined Grp.*, 56 Fed. Cl. at 521.  Therefore, even if the clause were mandatory, this would be the "exceptional case" in which I should not exercise my discretion to dismiss this case based on the forum-selection clause under *forum non conveniens*.  *See Atl. Marine Constr. Co.*, 134 S. Ct. at 581.  Thus, regardless whether the clause is mandatory or permissive, the case will remain in this Court.

## III.   Staying the Case

Alternatively, South Korea argues that the Court should exercise its discretion to stay the declaratory judgment action until the South Korean action is resolved, because this action "will not resolve the entire controversy," and "a parallel case is pending in another sovereign's courts."  Defs.' Mem. 22, 24.

The Declaratory Judgment Act, pursuant to which BAE filed suit, "provides that a court "*may* declare the rights and other legal relations of any interested party seeking such declaration."'" *State Farm Fire & Cas. Co. v. Oliver*, No. ELH-15-2140, 2015 WL 5934669, at *3 (D. Md. Oct. 8, 2015) (quoting *Wilton v. Seven Falls Co.*, 515 U.S. 277, 286 (1995) (quoting 28 U.S.C. § 2201(a)) (emphasis in *Wilton*)); *see also United Capitol Ins. Co. v. Kapiloff*, 155 F.3d 488, 493 (4th Cir. 1998). "'[A] declaratory judgment action is appropriate when the judgment will serve a useful purpose in clarifying and settling the legal relations in issue, and ... when it will terminate and afford relief from the uncertainty, insecurity, and controversy giving rise to the proceeding.'" *State Farm*, 2015 WL 5934669, at *3 (quoting *Penn–America Ins. Co. v. Coffey,* 368 F.3d 409, 412 (4th Cir. 2004) (citations and quotation marks omitted) (alteration in *Coffey*)).

Because the statutory language is discretionary,

> when a federal suit seeks only . . . declaratory relief, and there is another proceeding regarding the same issues pending in state court, "a district court may either stay the suit in favor of state court action or 'decline to exercise jurisdiction altogether by ... dismissing the suit or,'" when the case has been removed from a state tribunal, by "'remanding it to state court.'"

*State Farm*, 2015 WL 5934669, at *3 (quoting *Myles Lumber Co. v. CNA Fin. Corp.,* 233 F.3d 821, 823 (4th Cir. 2000) (quoting *Quackenbush v. Allstate Ins. Co.,* 517 U.S. 706, 721 (1996))). In deciding whether to exercise its discretion, the court considers "federalism, efficiency, and comity." *State Farm*, 2015 WL 5934669, at *3 (quoting *Coffey,* 368 F.3d at 412 (citations and quotation marks omitted)). Specifically, it considers

> "(1) whether the [forum] has a strong interest in having the issues decided in its courts; (2) whether the [alternate court, in this case, the South Korea court,] could resolve the issues more efficiently than the federal courts; (3) whether the presence of overlapping issues of fact or law might create unnecessary entanglement between the [other court] and federal courts; and (4) whether the

> federal action is mere procedural fencing, in the sense that the action is merely the product of forum-shopping."

*State Farm*, 2015 WL 5934669, at *4 (quoting *Kapiloff*, 155 F.3d at 493–94 (internal quotation marks and citations omitted)). Whether a court action is pending in another forum is "'a significant factor in the district court's determination,' but it 'is not dispositive.'" *State Farm*, 2015 WL 5934669, at *3 (quoting *Aetna Cas. & Sur. Co. v. Ind–Com Elec. Co.,* 139 F.3d 419, 423 (4th Cir. 1998)).

Significantly, *State Farm* and the cases it cites discuss parallel proceedings "in *state* court," as well as "federalism," which is "[t]he relationship and distribution of power between the national and *regional* governments within a federal system of government," *Black's Law Dictionary* 496 (Bryan A. Garner ed., abridged 7th ed., West 2000) (emphasis added). Here, the other pending action between the parties is in a South Korean court, such that the "significant factor" of a pending state court action and concerns of federalism are not invoked. *See Ind–Com Elec. Co.,* 139 F.3d at 423; *Coffey,* 368 F.3d at 412; *State Farm*, 2015 WL 5934669, at *3. Additionally, BAE seeks a declaration that the Guarantee is "incompatible with, and invalid under, the Foreign Military Sales Program ("FMS Program') and federal common law of the United States, and . . . therefore unenforceable." Second Am. Compl. ¶ 5. Such a declaration would terminate the controversy and moot the litigation now pending in South Korea, thereby "afford[ing] relief from the uncertainty, insecurity, and controversy giving rise to the proceeding." *See Coffey,* 368 F.3d at 412; *State Farm*, 2015 WL 5934669, at *3. It also would serve the interest of efficiency. *See Coffey,* 368 F.3d at 412; *State Farm*, 2015 WL 5934669, at *3. Likewise, a declaration of the parties' rights under the contracts could obviate the need for additional litigation in South Korea, unless this Court concluded that BAE breached a valid contract.

Certainly, if the *Kapiloff* factors pertain to a foreign action as well as state actions, the South Korean court likely has a strong interest in deciding a contract dispute concerning its government and may be able to resolve the contractual dispute more efficiently, if the MOA is valid and Korean law applies. But, while parallel litigation may lead to inconsistent outcomes, this suit surely is not "merely the product of forum-shopping." *See Kapiloff,* 155 F.3d at 493–94. Rather, BAE filed suit for a United States court to resolve a matter implicating national security interests, as discussed previously. Moreover, BAE filed suit in this Court on November 12, 2014, Compl. 22, before Defendants filed suit in South Korea. *See* Defs.' Mem. 3 ("BAE . . . brought this case to avoid litigating, in a Korean court . . . . The ROK has since brought litigation in the Korean Court seeking damages against BAE[].") ; Pl.'s Opp'n 9 ("With DAPA's notice of claim looming, BAE[] filed its Complaint seeking declaratory judgment."). And, the Korean suit has not gotten underway, as this one has, because BAE has not been served yet. Williams Decl. ¶ 4 ("BAE [] has not been served in the Korean suit."). Balancing these factors, I find that they weigh in favor of exercising this Court's jurisdiction and declining to stay the case during the pendency of the later-filed Korean action. *See Kapiloff,* 155 F.3d at 493–94; *Coffey,* 368 F.3d at 412; *State Farm*, 2015 WL 5934669, at *3.

## Conclusion

In sum, South Korea's Motion to Dismiss or Stay, ECF No. 26, IS DENIED. Additionally, South Korea's Opposed Motion to Extend Deadline, ECF No. 30, and Motion for Expedited Consideration, ECF No. 31, ARE DENIED AS MOOT. Insofar as South Korea sought to exceed the page limit due to lack of time to draft a shorter reply, South Korea's Motion for Leave to File Brief in Excess of Page Limits, ECF No. 33, IS GRANTED, and South Korea's Motion for Leave to File Corrected Brief, ECF No. 34, IS GRANTED. However, insofar as

South Korea raises new arguments in its reply, BAE's Motion to Strike the reply, ECF No. 37, IS

GRANTED.  BAE's Motion to Strike Paragraph 20 of Colonel Kang's Second Declaration, ECF

No. 37, IS DENIED AS MOOT.  The parties' joint request to file only the relevant portions of

the longer exhibits, ECF No. 38, IS GRANTED.  The parties' electronic submissions are

sufficient, and they need not file courtesy copies of the lengthy exhibits.  The parties' Joint

Motion to Seal, ECF No. 41, IS GRANTED.

A separate order will issue.


Date: <u>February 4, 2016</u>                    _____/S/_____

Paul W. Grimm
United States District Judge