## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MARYLAND
### *Southern Division*

|  |  |  |
|---|---|---|
| | * | |
| **BAE SYSTEMS TECHNOLOGY** | | |
|    **SOLUTION & SERVICES, INC.,** | * | |
| | | |
|     **Plaintiff,** | * | |
| | | |
| **v.** | * | **Case No.: PWG-14-3551** |
| | | |
| **REPUBLIC OF KOREA'S DEFENSE** | * | |
| **ACQUISITION PROGRAM** | | |
| **ADMINISTRATION,** *et al.*, | * | |
| | | |
|     **Defendants.** | * | |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## MEMORANDUM OPINION

This suit involves Defendant Republic of Korea's unsuccessful efforts through its Defense Acquisition Program Administration ("DAPA")[1] to upgrade its F-16 fighter fleet through the United States Government's Foreign Military Sales ("FMS") Program.  In a suit filed in the Seoul Central District Court in South Korea and in Counterclaims brought in this action, South Korea claims that Plaintiff BAE Systems Technology Solution & Services Inc. ("BAE") either (a) breached its obligations under a Memorandum of Agreement ("MOA") it entered with DAPA and under related Letters of Guarantee by failing to secure an agreed-upon price for the FMS transaction; or (b) committed fraud or negligent misrepresentation by giving the impression

---

[1] BAE originally filed suit against DAPA, Compl., ECF No. 1, and then amended to name the Republic of Korea as a second defendant, Am. Compl., ECF No. 12. I refer to Defendants together as "South Korea."

that it could do so.  *See* South Korea Compl., J.R. 1489–95; Defs. Counterclaims, ECF No. 53.[2]

BAE seeks a declaratory judgment that it is not liable under either contract or tort theories for its

inability to control the FMS transaction's cost.  Having found that this Court possesses and may

exercise jurisdiction over this action, Oct. 24, 2016 Mem. Op. & Order, ECF No. 103, the

pending matter before the Court is BAE's Motion for Summary Judgment, ECF No. 70.  The

parties have fully briefed the Motion, Pl.'s Mem., ECF No. 70-1; Defs.' Opp'n, ECF No. 75;

Pl.'s Reply, ECF No. 77, and no hearing is necessary, *see* Loc. R. 105.6 (D. Md.).  Because the

FMS Program is designed to prevent litigation between foreign governments and U.S. defense

contractors and because I find that the preliminary contract between BAE and South Korea is not

divisible from the resulting FMS transaction, I will grant BAE's motion.  I will also lift the

preliminary injunction I previously issued against South Korea, July 19, 2016 Mem. Op. &

Order, ECF No. 84, that has prevented it from prosecuting its suit against BAE in the Seoul

Central District Court.

## **Background**

### The FMS Program

Military equipment manufacturers in the United States may sell their
equipment to foreign governments through Direct Commercial Sales ("DCS") or
the Foreign Military Sales ("FMS") Program. *Sec'y of State for Defence v.
Trimble Navigation Ltd.*, 484 F.3d 700, 703 (4th Cir. 2007). The FMS Program
"provides a mechanism for the United States government to sell defense articles
and services to foreign governments," where the President finds "that the sale
'will strengthen the security of the United States and promote world peace.' "
*Heroth v. Kingdom of Saudi Arabia*, 565 F. Supp. 2d 59, 61 (D.D.C. 2008), *aff'd*,
331 F. App'x 1 (D.C. Cir. 2009) (quoting 22 U.S.C. § 2753(a)(1) (provision of
Arms Export Control Act, 22 U.S.C. §§ 2751 *et seq.*)). In the FMS Program, "the
United States and the foreign government purchaser enter into a contract for
the goods, which the United States then provides from its own inventory or purchases
from a domestic contractor through a separate agreement." *Trimble*, 484 F.3d at

---

[2] Citations to "J.R." refer to the Joint Record filed by the parties in the case. *See* ECF Nos. 39–
40, 81.

703. Thus, "[a]n FMS purchase involves two contracts: one between the foreign government and the United States, termed the Letter of Agreement ("LOA"), and one between the United States and the domestic contractor." *Id.* "Notably, *there is no contract between the foreign government and the defense contractor*" when a foreign government acquires goods or services through the FMS Program. *Heroth*, 565 F. Supp. 2d at 61–62 (emphasis added). In contrast, the foreign government and the domestic contractor enter into their own agreement in a DCS transaction. *Trimble*, 484 F.3d at 703.

Feb. 4, 2016 Mem. Op. 6, ECF No. 43.

As a necessary and, indeed, intended byproduct of this absence of contractual privity between FMS buyers and sellers, foreign sovereigns forgo significant control over FMS transactions. *See Trimble*, 484 F.3d at 707 ("[T]he FMS program requires the intermediation of the United States and a back-to-back contract structure[, which] reflects the national security interests of the United States . . . ."). While the FMS Program allows foreign sovereigns "to take advantage of the United States' procurement contract experience or ability to obtain discounted prices," *id.* at 706, the Program requires FMS customers to permit the United States to "determine[] the contract type, select[] the contract source, and *negotiate[] prices* and contract terms with the individual contractor." Def. Inst. of Sec. Assistance Mgmt., *The Management of Security Assistance* 15-4 (27th ed. 2016) (emphasis added), *available at* http://www.disam.dsca.mil/pubs/DR/27th%20Greenbook.pdf. In short, the foreign sovereign must "trust[] the [U.S. Government] to negotiate a contract that meets [its] needs." *Id.*

<u>South Korea's F-16 Fleet Upgrades</u>

This case arises from South Korea's efforts to participate in the FMS Program while retaining the level of control that it would exercise in a DCS transaction. In 2011, South Korea sought to upgrade its F-16 fighter fleet through the FMS Program. South Korea solicited bids from U.S. defense contractors. Joint Statement of Undisputed Facts ¶¶ 1–2, ECF No. 69. BAE and Lockheed Martin each submitted bids for the project. Joint Statement ¶ 2; BAE, Proposal

for KF-16 Upgrade Program (Dec. 2, 2011), J.R. 117–521.  In August of 2012, DAPA and BAE entered into a MOA that designated BAE as the defense contractor that DAPA wished to perform the upgrades.  *See* Memorandum of Agreement (MOA) art. 7, J.R. 558.[3]  This designation reflected South Korea's right under the FMS Program regulations to request a specified contractor for the transaction (but without obligating the U.S. Government to accept its request).  *See* DFARS 225.7304(a).  In exchange for being named as the requested contractor, BAE promised to "put forth its best effort" to secure enumerated contract terms—including a predetermined contract price—in an LOA between South Korea and the U.S. Government.  MOA arts. 1–2, 3(2), J.R. 555–56.  As part of the bid process, BAE submitted a Letter of Guarantee to DAPA in which it promised to pay DAPA $43,250,000 if it "fail[ed] to execute the contract with DAPA after the bid is awarded to [BAE]" or to "respond timely to the evaluation formalities of the bidder's qualification if [BAE] is designated as an eligible bidder."  Dec. 5, 2011 Letter of Guarantee for Payment of Bid Bond (Revised), J.R. 813.[4]  BAE submitted five additional revised Letters of Guarantee between 2011 and 2014.  Joint Statement ¶¶ 4, 14.[5] Although the MOA did not reference the Letters of Guarantee, it authorized South Korea to demand payment of the $43,250,000 promised in the Letters if delays occurred due to BEA's failure to secure the contract terms specified in the MOA in the final FMS contract. *See* MOA

---

[3] The MOA's explicit objective was to document what BAE would propose "for inclusion into the anticipated FMS LOR [between DAPA and the U.S. Government] . . . regarding . . . the KF-16 Upgrade Program."  MOA art. 1, J.R. 555.  It is beyond dispute that the MOA was not an ancillary side agreement between DAPA and BAE that was separate from but related to the FMS agreement to upgrade the Korean F-16 fleet, as South Korea unpersuasively contends.  *See* Defs.' Opp'n 5, 8–10.

[4] This initial Letter of Guarantee revised superseded another Letter that DAPA rejected for failure to conform with the format it specified. Joint Statement ¶ 3; *see also* Nov. 22, 2011 Letter of Guarantee, J.R. 811–12.

[5] *See also* Dec. 12, 2011 Letter of Guarantee, J.R. 814; June 21, 2013 Letter of Guarantee J.R. 815; Sept. 19, 2013 Letter of Guarantee, J.R. 816; Apr. 10, 2014 Letter of Guarantee, ECF No. 674; Sept. 30, 2014 Letter of Guarantee, J.R. 1405–06.

art. 8, J.R. 559.[6]  The MOA provided that execution of a LOA "automatically terminate[s]" the

MOA, "reliev[ing] [BAE] of all obligations under this MOA and the" Letter of Guarantee.  *Id.*

art. 7, J.R. 558.

In September 2013, the U.S. Government, DAPA, and BAE met to discuss the pricing of

the upgrade program and agreed to divide the upgrade work between two separate LOAs, one

addressing "pre-planning activities and long-lead support" items and the other addressing the

bulk of the upgrade program.  KF-16 Upgrade Program Meeting Minutes ¶ 15A (Sept. 5–10,

2013), J.R. 1445–56; Joint Statement ¶ 8. The meeting minutes note that the U.S. Government

and BAE offered diverging estimates of the upgrades' cost.  *Id.* ¶ 6, J.R. 1439.  But the U.S.

Government emphasized "that there is only one cost which is relevant, and that was the FMS

program cost estimate provided by" the U.S. Government.  *Id.*   Nonetheless, the U.S.

Government agreed to "work with BAE to achieve" South Korea's "aggressive . . . cost goals,"

while emphasizing that "there are no guarantees that future funding will not be required during

program execution." *Id.* ¶ 15C, J.R. 1446.

One month later, the U.S Government and South Korea finalized a LOA for the pre-

planning components of the F-16 upgrades. Letter of Offer and Acceptance (LOA), J.R. 658–73.

The LOA approved BAE as the contractor to perform the upgrades.  LOA 3, Note 1, 6, Note 4,

J.R. 659, 662.  It also provided a $1.05 billion estimate for the upgrades, LOA 4, Note 1, J.R.

660, but obligated South Korea "[t]o pay . . . the total cost" of the upgrades "even if the [final]

costs exceed the amounts estimated in the LOA," *id.* at 12, § 4.4.1, J.R. 667; *see also* SAMM

§ C5.F4, Standard LOA Terms § 4.4.1.  Importantly, the LOA also required the two sovereigns

"to resolve any disagreement regarding this LOA by consultations" and prohibited referral of any

---

[6] South Korea refers to Article 8 of the MOA as a liquidated damages provision in its Complaint
filed in the Seoul Central District Court.  South Korean Compl. 1, J.R. 1489.

"disagreement to any international tribunal or third party for settlement." LOA 14, § 7.2; *see also*

SAMM § C5.F4, Standard LOA Terms § 7.2.

About one year later, the U.S. Government informed South Korea that, despite its best

efforts, the costs of the upgrades would exceed $1.705 billion.   Letter from Col. David C.

Wright, Acting Dir. Reg'l Affairs, U.S. Air Force, to Col. Kang, Byeong-Ho, Def. Acquisition

Program Admin. (Aug. 21, 2014), J.R. 1448–49 (estimating cost of $2.060 billion); Letter from

Heidi H. Grant, Deputy Under Sec'y, U.S. Air Force, to Brig. Gen. Kim, Won-sik, Def.

Acquisition Program Admin. (Sept. 29, 2014), J.R. 1450–51 (estimating cost between $2.4 and

$2.5 billion).  The U.S. Government explained that it arrived at its revised estimate by consulting

"historical data from similar F-16 development programs."   Letter from Heidi H. Grant to Brig.

Gen. Kim, Won-sik, J.R. 1450.   In response, South Korea demanded that BAE pay DAPA

$43,250,000 for violating the MOA.   DAPA Notice of Claim, J.R. 1452–54; Joint Statement

¶ 13.   About one month later, the U.S. Government terminated the Upgrade Program over South

Korea's inability to agree to the revised price.   Memorandum from Air Force Life Cycle Mgmt.

Ctr. to BAE Sys. Tech. Sol. & Servs. Inc., J.R. 1465–1468; Joint Statement ¶ 16.   Shortly

thereafter, BAE filed its Complaint in this Court.   ECF No. 1.

Both BAE and South Korea acknowledge that a FMS contract governed the intended

F-16 upgrades, *see* Pl.'s Mem. 1; Defs. Opp'n 10–12, and that the FMS program prohibits a

foreign sovereign from enforcing a FMS contract, *see* Pl.'s Mem. 2, 4; Defs.' Opp'n 5.   South

Korea argues, however, that the FMS program does not prohibit "FMS customers and U.S.

contractors from negotiating and agreeing to [independent] contracts [such as the MOA] related

to an FMS sale of military equipment or services" and that BAE is liable under the MOA for its

failure to "use its best efforts to reach agreement with the [U.S. Government] to include certain

contract terms and scope of work in the LOA between [the two sovereigns]."  Defs.' Opp'n 5,

12; *see also* MOA art. 1, J.R. 555.  BAE contends that the MOA is not divisible from the FMS

transaction.  *See* Pl.'s Mem. 16–17, Pl's Reply 12–13.  If, as BAE argues, the FMS program bars

South Korea from suing BAE for its asserted failure to secure South Korea's preferred contract

price, then South Korea contends that it is entitled to damages for BAE's allegedly fraudulent or

negligent misrepresentations about the validity and enforceability of the MOA.  Defs.' Opp'n

18–19.  BAE argues that the FMS Program also prohibits South Korea's Counterclaims and, in

the alternative, that they are not cognizable.  Pl.'s Mem. 17–19; Pl.'s Reply 13.

## Standard of Review

Summary judgment is proper when the moving party demonstrates, through "particular

parts of materials in the record, including depositions, documents, electronically stored

information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or

other materials," that "there is no genuine dispute as to any material fact and the movant is

entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a), (c)(1)(A); *see also Baldwin v.

City of Greensboro*, 714 F.3d 828, 833 (4th Cir. 2013).  If the party seeking summary judgment

demonstrates that there is no evidence to support the nonmoving party's case, the burden shifts to

the nonmoving party to identify evidence that shows that a genuine dispute exists as to material

facts.  *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 & n.10

(1986).  The existence of only a "scintilla of evidence" is not enough to defeat a summary

judgment motion.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986).  Instead, the

evidentiary materials submitted must show facts from which the finder of fact reasonably could

find for the party opposing summary judgment.  *Id.*  A "genuine" dispute of material fact is one

where the conflicting evidence creates "fair doubt"; wholly speculative assertions do not create

"fair doubt." *Cox v. Cnty. of Prince William*, 249 F.3d 295, 299 (4th Cir. 2001); *see also Miskin v. Baxter Healthcare Corp.*, 107 F. Supp. 2d 669, 671 (D. Md. 1999). The substantive law governing the case determines what is material. *See Hooven–Lewis v. Caldera*, 249 F.3d 259, 265 (4th Cir. 2001). A fact that is not of consequence to the case, or is not relevant in light of the governing law, is not material. *Id.*; *see also* Fed. R. Evid. 401 (defining relevance).

## Discussion

### Breach of Contract

In ruling that this case should not be dismissed on *forum non conveniens* grounds, I held that the MOA and FMS contract "were inextricably intertwined" and that "enforcement of the MOA, in isolation from the much larger FMS LOA between South Korea and the United States would fly in the face of the FMS Program and the U.S. Government's directive, which implicates U.S. security interests." Feb. 4, 2016 Mem. Op. 23–24 (citing *Sec'y of State for Defence v. Trimble Navigation Ltd.*, 484 F.3d 700, 707 (4th Cir. 2007)). In so ruling, I relied on *Trimble*, which held that an FMS customer could not sue a defense contractor as a third-party beneficiary of a LOA because "it would be contrary to the statutory scheme to imply a direct relationship between the domestic contractor and the foreign purchaser." 484 F.3d at 707. BAE contends that my prior ruling governs the outcome of this case. Pl.'s Mem. 16–17. South Korea raises two principal arguments for why that ruling does not resolve the matter, neither of which are availing.

First, South Korea suggests that the regulations governing FMS transactions permit foreign sovereigns to indirectly control the FMS contract prices through price competitions and that it can therefore hold BAE liable for its inability to ensure that the price estimated in its bid became the final contract price. Defs.' Opp'n 6–8, 12–18. BAE disputes South Korea's reading

8

of the regulations but maintains that South Korea's claims would be barred even under its interpretation. Pl.'s Reply 4–11.  BAE is correct.

 South Korea's argument rests on two basic assertions about the FMS regulations: (1) that the regulations permit the FMS customer to "direct the [U.S. Government] to award the [FMS] contract . . . to a specific contractor"; (2) that they permit "a foreign government to hold a competition to select a contractor and in that competition, establish the price that should determine the price that the contractor charges the [U.S. Government] for its equipment and services." Defs.' Opp'n 6, 14–15.

The FMS regulations provide:

> FMS customers may *request* that a defense article or defense service be obtained
> from a particular contractor.  In such cases, FAR 6.302-4 provides authority to
> contract without full and open competition.  The FMS customer may also *request*
> that a subcontractor be placed with a particular firm.  The contracting officer shall
> honor such requests from the FMS customer only if the LOA or other written
> directions sufficiently fulfills the requirements of FAR Subpart 6.3.

DFARS 225.7304(a) (emphasis added).  The obligatory "shall honor" language appears at odds with DFARS 225.7304(f), which directs the U.S. Government "not [to] accept directions from the FMS customer on source selection decisions."   South Korea argues that the discretionary authority provided by DFARS 225.7304(f) only applies to sole-source requests that do not comply with the regulations referenced in DFARS 225.7304(a). Defs.' Opp'n 15–17 (citing *In re: Julie Research Labs., Inc. Reconsideration*, No. B-218244, 1985 WL 52865, at *2 (Compt. Gen. June 12, 1985)).  In other words, South Korea views DFARS 225.7304(a) as an "exception" to the discretionary authority granted in DFARS 225.7304(f).  *Id.* at 17.   BAE argues that DFARS 225.7304(a)'s "shall honor" language applies only to subcontracts, not prime contracts. Pl.'s Reply 7 & n.3 (citing *Hyperion, Inc. v. United States*, 120 Fed. Cl. 604 (2015)).  Whichever side's reading of the FMS regulations is better, there is no dispute that the U.S. Government did

in fact honor South Korea's request for BAE to perform the FMS contract, LOA 3, Note 1, 6, Note 4, J.R. 659, 662; Joint Statement ¶ 11, so the parties' disagreement over this aspect of the regulations is immaterial because the dispute at hand centers on the price of the contract, not the entity intended to perform it.

Once a contractor is selected to perform a FMS contract, the U.S. Government determines the contract price, *see* DFARS 225.7303(a) (designating the U.S. Government as the entity that "[p]rices FMS contracts."), which it does in the same manner that it prices domestic defense contracts, *id.* Before negotiating a domestic military contract, the U.S. Government "obtain[s] certified cost or pricing data" to assist it in "establish[ing] a fair and reasonable price." FARS 15.402(a). The U.S. Government need not obtain such information, however, if an "adequate price competition" occurs. FARS 15.403-1(b)(1). Similarly, a FMS customer can avoid an obligation to provide "certified cost or pricing data," DFARS 225.7303(a), by "conduct[ing] a competition resulting in adequate price competition," DFARS 225.7303(b) (cross-referencing FAR 15.403-1(b)(1)). South Korea contends that the U.S. Government loses its discretion over the contract price by entering a FMS contract with a contractor selected by an adequate price competition. Defs.' Opp'n 7–8 (citing Defense Security Cooperation Agency (DSCA), Security Assistance Management Manual (SAMM) C.6.3.2 ("When foreign government conducts a competition for a weapon system . . . that competition should determine the price to be paid.); Memorandum from DSCA to Deputy Under Sec'y Army (Int'l Affairs) et al. attach. 1 (Jan. 19, 2000) ("[C]ompetitions run by foreign governments should determine the price to be paid . . . even if the sale to the foreign government is then processed as a foreign military sale . . . .")). But, as BAE correctly notes, the disputed regulations address the information the foreign sovereign must provide in order for a price *to be determined* and do not

circumscribe the U.S. Government's ability *to adopt* a different price based on other information, Pl.'s Reply 5–6 & n.2, as the U.S. Government did here, Letter from Col. David C. Wright to Col. Kang, Byeong-Ho, *supra*, at 1 ("Based upon the most recent USG and contractor data, extensive analysis, . . . the USG's current independent cost estimate for program execution is in excess of $2.06B."); Letter from Heidi H. Grant to Brig. Gen. Kim, Won-sik, *supra*, at 1 ("We now estimate the total program cost at moderate risk to be $2.4B-$2.5B.  This cost is based upon historical cost data from similar F-16 development programs . . . ."); KF-16 Upgrade Meeting Minutes 2–3 (Sept. 11, 17, 2014), J.R. 1697–98 (describing revised cost estimate methodology based on "other similar F-16 modifications," which was prompted by updated price estimates from BAE due to "the learning curve for both BAE and USG resulting from meeting the LOR requirements").

But in making its argument that the U.S. Government lost its right to determine the FMS contract price once South Korea selected BAE through an adequate price competition, it proves too much.  This is because even if South Korea's characterization of the FMS regulations were accurate, its grievance is with the U.S. Government for violating the regulations, not BAE for breaching its contractual obligations.  BAE complied with every step of the FMS process even as South Korea conceives of it.  BAE participated in a price competition and identified the price at which it was willing to perform the FMS transaction. *See* Joint Statement ¶ 2; Proposal for KF-16 Upgrade Program, *supra*, § 3.17.8, J.R. 473–74 (providing cost for BAE's bid to perform F-16 upgrades).[7]  Under South Korea's reading of the regulations, those are the only actions

---

[7] The parties dispute whether BAE modified its own price estimate after the submission of the LOR.  *See* Pl.'s Mem. 10 ("[T]he U.S. Government's price increase was based on its historical experience with Lockheed Martin for previous F-16 upgrade programs, **not** on decisions of, or actions taken by, BAE TSS."); Defs.' Opp'n 4 n.4 ("[I]n September 2014, the USG told Defendants that part of the price increase was the result of BAE increasing its price by $270

required for BEA to bind the United States to a predetermined FMS-contract price:  After South Korea selected BAE as the winner of the price competition, the U.S. Government could either refuse to enter into an FMS agreement with South Korea or contract with BEA at the price memorialized in its bid.  According to South Korea's interpretation of the regulations, it was the U.S. Government, not BEA, that ran afoul of its obligations.  But because, as South Korea concedes, the FMS Program prohibits a foreign sovereign from suing the U.S. Government for violating a LOA, Defs.' Opp'n 11, South Korea instead seeks to hold BEA liable for the U.S. Government's conduct.  BEA is not liable—under contract law or any other legal theory—for the U.S. Government's regulatory noncompliance.  And the remedy for any "disagreement" that South Korea has with the U.S. Government over the FMS transaction is sovereign-to-sovereign "consultation," not "refer[al]" to a "third party" such as this Court or the Seoul Central District Court. LOA 14, § 7.2; *see also* SAMM § C5.F4, Standard LOA Terms § 7.2.

Alternatively, South Korea attempts to characterize the MOA between DAPA and BAE as an "offset agreement."  Defs.' Opp'n 17.  This sleight of hand is unavailing.  The FMS regulations note that the U.S. Department of Defense "does not encourage, enter into, or commit U.S. firms to FMS offset arrangements," but they do not prohibit defense contractors from entering into them.  DFARS 225.7306.  The term "offset" as used in the regulations is "an inducement or condition to purchase military supplies or services, including benefits such as coproduction, licensed production, subcontracting, technology transfer, in-country procurement, marketing and financial assistance, and joint ventures." PGI 225.7303-2(a)(3)(A) .  Such offsets encompass:

---

million." (citing KF-16 Upgrade Meeting Minutes, *supra*, at 3)).  This factual dispute, however, is not material because regardless of which entity initiated the price-estimate revisions, there is no dispute that the U.S. Government was the entity that ultimately increased the estimate.

(i)     A direct offset[, which] involves benefits, including supplies or services that are directly related to the item being purchased. For example, as a condition of a U.S. sale, the contractor may require or agree to permit the purchaser to produce in its country certain components or subsystems being sold. . . .

(ii)    An indirect offset[, which] involves benefits, including supplies or services that are unrelated to the item being purchased. For example, as a condition of a sale the contractor may agree to purchase certain of the customer's manufactured products, agricultural commodities, raw materials, or services.

*Id.*  As BAE correctly notes, none of the offset agreements contemplated by the regulations "govern the terms and conditions of the FMS transaction."  Pl.'s Reply 12.

The MOA made BAE responsible for ensuring that the LOA included predetermined contract terms, including the contract price.  MOA arts. 1–2, 3(2), J.R. 555–56.  It did not, as contemplated by the regulations' definition of offsets, confer an ancillary benefit to one party or the other to engage in the FMS transaction.  *See* PGI 225.7303-2(a)(3)(A).  For example, the MOA did not obligate BAE to produce components for the upgrades in South Korea or require South Korea to purchase unrelated products from BAE.  Rather, it sought to shape the scope and cost of the FMS transaction.

Neither South Korea's interpretation of the FMS regulations nor its characterization of the MOA as an offset agreement negates my view that "the crux of the *Trimble* opinion applies" here.  Feb. Mem. 4, 2016, Op. 23.  Enforcement of the MOA as an independent contract divisible from the FMS transaction would run counter to U.S. national security interests.  *See id.* at 23–24.  Although the instant case and *Trimble* differ in that South Korea does not seek third-party beneficiary status, South Korea, like the FMS customer in *Trimble*, seeks to do indirectly what the FMS regulations prohibit it from accomplishing directly—namely sue BAE for its performance on an FMS contract.  BAE is entitled to a declaration that the FMS Program and federal common law bar South Korea from suing BAE for breaching the MOA.  I will therefore grant summary judgment in its favor.  Accordingly, I will dismiss as moot Counts I, II, III, and V

of BAE's Second Amended Complaint, which all argue that BAE should prevail on the merits of

South Korea's contract-law claims. *See* Second Am. Compl. ¶¶ 68–82, 89–96, ECF No. 22.

Tort Counterclaims

Since the FMS Program's structure bars a breach-of-contract claim against BAE, South

Korea contends that BAE is liable for fraudulently or negligently misrepresenting its capacity to

ensure the adoption and enforcement of South Korea's preferred contract terms.   But South

Korea advances no authority for its argument that it may bring torts arising out of a contract

claim against BAE, and BAE is quick to point out that "a tort claim cannot be based on an

alleged breach of contract."  Pl.'s Mem. 18 (citing *Kwang Dong Pharma. Co. v. Han*, 205 F.

Supp. 2d 489, 495 (D. Md. 2002)).[8]  While BAE only cites authority supporting its argument in

the context of the fraud Counterclaim, this Court has taken a similar position in the context of

negligent misrepresentation claims.  *See Bierman v. United Farm Family Ins. Co.*, RDB-12-

2445, 2013 WL 1897781, at *7 (D. Md. May 6, 2013) (dismissing negligent misrepresentation

claim that "essentially repeat[ed] Plaintiff's claim for breach of contract").

South Korea does not address this argument, apart from noting its perceived need for

"additional discovery concerning BAE's actual representations about the KF-16 Upgrade

Program." Defs.' Opp'n 20.  Discovery concluded in this case on November 11, 2016. *See* Mar.

33, 2016 Paperless Order, ECF No. 59 (approving Motion to Modify Scheduling Order, ECF No.

58).  South Korea could have requested an extension of the discovery deadline but has not. If

between filing its Opposition on May 16, 2016 and the discovery deadline South Korea had

---

[8] BAE also argues the Counterclaims are non-cognizable because they rely on "representation of law," which it argues is "a nonactionable statement of opinion," and because "as a matter of law, DAPA could not have reasonably relied on BAE TSS' alleged representations regarding the scope, timing, or pricing of KF-16 Upgrade Program." Pl.'s Mem. 18–19.  Because I find that South Korea did not provide evidence of fraud or negligent misrepresentation outside the MOA itself, I do not address these arguments.

discovered evidence of representations made by BEA independent from the MOA itself on which South Korea relied to its detriment, it could have requested permission to file a surreply. Again, it did not. Thus, the Court will not speculate about the existence of evidence outside the record that supports South Korea's tort Counterclaims. Accordingly, BAE is also entitled to summary judgment in its favor with respect to those Counterclaims.

Preliminary Injunction

During the pendency of the case, I granted BAE's Motion for Preliminary Anti-Suit Injunction "until the resolution of the threshold issue of subject matter jurisdiction and the pending motion for summary judgment." July 19, 2016 Mem. Op. & Order 36–37. Having determined that the Court does have subject-matter jurisdiction over the matter and can exercise it, Oct. 24, 2016 Mem. Op. & Order, and because I now will grant summary judgment in BAE's favor, I will also lift the preliminary injunction. Should South Korea proceed with its claims against BAE in its own courts, BAE may defend against the claims by asserting any claim or issue preclusion that this judgment may afford it under Korean law.

## Conclusion

The FMS Program is specifically structured to require disagreements that arise during FMS transactions to be resolved through sovereign-to-sovereign consultation rather than through litigation. Permitting South Korea to enforce a contract against BAE that holds the contractor accountable for ensuring that predetermined contract terms govern the FMS transaction would run contrary to the FSM Program's structure and the national-security interests that underlie it. BAE is therefore entitled to a declaration that South Korea's breach-of-contract claims are unenforceable. Moreover, South Korea's tort Counterclaims fail because a party's alleged

breach of contract, by itself, cannot be the basis of fraud or negligent misrepresentation claims.

BAE is entitled to summary judgment.

A separate Order follows.

Dated: <u>December 7, 2016</u>                                 _____/S/_____

                                                                          Paul W. Grimm
                                                                          United States District Judge

jlb